**Paul H. KOELLER, Plaintiff,**

v.

**Robert H. FINCH, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. W–4236.**

United States District Court,
D. Kansas.

July 6, 1970.

---

**534**

Kirke W. Dale, of Dale, Hickman & Mills, Arkansas City, Kan., for plaintiff.

Robert J. Roth, U. S. Atty., Bernard V. Borst, Asst. U. S. Atty., Wichita, Kan., for defendant.

## DECISION AND ORDER

WESLEY E. BROWN, District Judge.

This action for review of the final order of the Secretary of Health, Education and Welfare, made and entered August 20, 1969, denying claimant's application for federal old-age insurance benefits, is before the Court on cross motions for summary judgment.

Paul H. Koeller filed his application for retirement insurance benefits under the Social Security Act, 42 U.S.C. § 401, et seq., on March 13, 1968 [Tr. 142–145]. The application was initially denied because "based on the information in the file, it is determined that your services and wages will exceed the minimum allowable for payment purposes." [Tr. 146]. At the request of Mr. Koeller his claim was reconsidered and again denied. [Tr. 150–153]. He next requested a

hearing stating "I feel that I am retired and eligible for benefits." [Tr. 154]. The hearing was held in Wichita, Kansas on January 7, 1969 at which the claimant and his attorney, Kirke W. Dale, were in attendance. The general issues to be determined were "whether the claimant is entitled to retirement insurance benefits under Section 202(a) of the Social Security Act, as amended, beginning April 1968." The specific issues on which findings were to be made and conclusions to be reached were "whether deductions should be imposed on the claimant's benefits in accordance with Section 203(b) of the Social Security Act, as amended, which depends on whether the claimant had excess earnings and/or rendered substantial services under Section 203(f) of the Social Security Act, as amended." [Tr. 37].

After reviewing all of the evidence, the hearing examiner concluded that Mr. Koeller was entitled to retirement insurance benefits pursuant to his application filed March 13, 1968. [Tr. 25–29]. The Appeals Council, reviewing the hearing examiner's decision on its own motion, determined that additional evidence was necessary and remanded the case to the hearing examiner for the purpose of obtaining additional evidence. Mrs. Edith W. Koeller was made a party to the action, [Tr. 20], and a supplemental hearing was held on May 21, 1969 in Wichita, Kansas. [Tr. 80–141]. After the hearing and having reviewed the entire record in this case, the Appeals Council concluded,

"It is the decision of the Appeals Council that deductions are applicable against benefits based on the claimant's earnings record for the months April 1968 through December 1968. The decision of the hearing examiner is reversed." [Tr. 4–11.]

The evidence which the Appeals Council utilized in reaching its determination that Mr. Koeller was not entitled to retirement benefits under the Act is presently before the Court at this time. We will summarize the testimony at the two

hearings, although much of it is repetitious.

*The Hearing on January 7, 1969.*

Mr. Koeller testified that he lives with his wife, Edith Koeller, and one child in Arkansas City, Kansas. Three older children now live in Hobbs, New Mexico, McCook, Nebraska and Overland Park, Kansas. They have never lived at the Motel which Mr. and Mrs. Koeller now operate. Mr. Koeller has completed two years of college. Prior to engaging in the Motel business, he had worked fifteen years for International Harvester Company as a field representative, salesman and also worked in the credit department. Nine of his years were spent connected with a retail farm equipment business, and the next seven years he operated a liquor store. Mrs. Koeller has previously worked as a secretary.

In 1946 the Koeller Realty Company was incorporated. Mrs. Koeller's brother, Joseph Ziegler, originally owned all of the stock with the understanding that Mr. and Mrs. Koeller would later be able to acquire the stock. The corporation has never paid any dividends. Mr. Koeller leased a building from the realty company while engaged in a farm machinery retail business. That business soon terminated and the building was leased by the corporation to several different tenants. On October 21, 1951 the Koellers purchased all of the corporation stock. At that time the only asset of the corporation was the building. From 1953 when he terminated his retail farm machinery business to 1960, Mr. Koeller was in the retail liquor business. His wife did not assist in that business, but he did hire one full-time employee. In 1961 a Ronald Petty purchased some corporation stock, but in July of 1967 he resold the stock to the corporation.

The building which had housed his farm machinery was demolished and salvaged in the Spring of 1961, and the Motel, the Town House Motor Inn, which the Koellers now operate was constructed on that site. The Motel is presently comprised of twenty-six units, a swimming pool and a restaurant which has always been leased by at least two tenants. The Motel office has room for the night clerk to rest, and it is equipped with a switchboard which is in operation all night. The rooms all have television. A lounge in which beer is sold and there are two pool tables, is also leased to other individuals.

Mr. Koeller acquainted himself with the motel business from his personal travel experience and by reading many motel magazines. After the first two years of operation, before Mr. Koeller alleges he retired, but on April 1, 1968, he worked at the Motel desk on a regular eight-hour shift, seven days a week. He spent many extra hours looking after details of management, and he worked extra shifts when other clerks had their day off. On such days he would spend sixteen hours at the desk. Two other clerks worked full time and occasionally one would be hired parttime. Mr. Koeller also checked the rooms after the maids had completed their work, ordered supplies, checked the physical condition of the plant, interviewed all prospective employees, scheduled advanced reservations, made up the weekly payroll and did the month-end posting. Mrs. Koeller did the daily posting. The Motel was normally well filled during the week with fewer people in on the week-ends, which was normal for a motel in their location.

Mrs. Koeller worked at the Motel from its inception, and prior to April, 1968 she did the daily posting, made bank deposits and substituted for Mr. Koeller when he was away from the Motel. In Mr. Koeller's absence she would generally perform all duties of a desk clerk.

Following his alleged retirement on April 1, 1968, Mr. Koeller has altered his work schedule to an hour and a half a day at the desk, which is from 8:00 to 9:30 in the morning, six days a week, and four hours on Sunday morning. He claims that now, even when he is scheduled to work, he is free to come and go as he pleases, and that other clerks perform his duties in his absence. He has gone quail hunting numerous times and now has time to become involved in community

activities. He was chairman of the brochure committee which created a new brochure for Arkansas City, was involved in a United Fund Drive, and at the time of the hearing he anticipated working in a membership drive for the Chamber of Commerce. Mr. Koeller stated that he also spends much more time at home "tinkering" and now has time to work in his yard.

Since his alleged retirement Mr. Koeller stated that Mrs. Koeller's hours have increased, and she works seven days a week. Extra help was also hired, and the payroll increase, excluding the salary paid to Mrs. Koeller, amounts to approximately $2,619 a year. When he is away from the motel, he claims that he does no work concerning the motel. Mr. Koeller alleges he now only performs what amounts to clerical duties while his wife manages the Motel, including the hiring of employees. He feels that the $140 he receives as salary each month is reasonable for the services he now performs. If there are calls at home at night concerning problems at the Motel, Mrs. Koeller takes the call. In substance, the January 7, 1969 hearing concluded at this point.

On April 18, 1968 a Social Security field representative made an unannounced visit to the motel and found Mrs. Koeller at the desk. [Tr. 161–163]. He observed the physical layout of the Motel, and watched Mrs. Koeller as she carried out her duties. While the field representative was at the Motel Mrs. Koeller checked out two maids who had completed their work for the day, paid some advertisement bills which was normally done by her husband, and conducted other business on the telephone. Having observed her activities, the field representative reported, "It is my opinion that she is capable of 100% management of the Motel." Mrs. Koeller told him that Mr. Koeller, prior to his "retirement" had normally worked from 8:00 A.M. to 10:00 P.M., except for short periods of relief she gave him when he needed to leave the Motel for some reason. Since April 1, 1968 she said that he now only works from 8:00 A.M. to 9:30 A.M. A girl has been hired full time and has been working at the Motel since 1967. Mrs. Koeller feels that the girl is quite competent. A seventy-four year old lady has been hired to tend to small emergencies from 10:00 P.M. to 8:00 A.M. A full time handyman is employed to work around the motel taking care of the swimming pool, trash and maintenance work. Mrs. Koeller stated that Mr. Koeller hopes to golf, fish and hunt more than in the past, and they both plan to take more vacations. The field representative concluded that on the basis of his observations and contact with Mrs. Koeller,

"In conclusion, it is noted W/E has cut his salary to ⅕ of former rate ($700.00 per mo. to $140.00 per mo.). However, I feel he has cut his time in the business by a comparable ration, and has made a bona-fide attempt to meet the requirements of the retirement text. It is my opinion we should establish his retirement as alleged 4/68 on." [Tr. 163.]

Based on the testimony given at the hearing on January 7, 1969 and the report of contact of the field representative, the hearing examiner commented as follows:

"A mere continuation of a business by a corporation does not automatically mean that the claimant is not entitled to receive his social security retirement benefits if in fact he has cut down his duties and there has been a change in substance. There is not one single shred of evidence in this case to indicate that the claimant is spending more than 54 hours a month at the motel. His wife has taken over the claimant's duties and is receiving a salary which is comparable to what the claimant received when he was managing the motel. There is nothing wrong in paying the claimant's wife a sum of money to which she is entitled. The claimant has cut down his hours and is working a maximum of 54 hours as a clerk. As a matter of fact, according to the testimony at the hearing, it would appear that the claimant

will only work 40 to 45 hours this present month or less. The cost of help at the motel has increased due to the claimant's reduction in hours even though he is still working at the motel. His salary of $140 a month, which is approximately $3 an hour, is very adequate for the claimant's services. From this examiner's knowledge of salaries of temporary or desk help at the motels, it appears that it is doubtful whether any of the motels pay much over $1 or $1.50 an hour. Most of them pay the bare minimum required by law and as a result, usually hire help who are retired and drawing some sort of pension or social security. These people will work for a small amount of money merely to supplement their income. There is no reason to believe, under these circumstances, that the amount of money the claimant is receiving, in the sum of $140 a month, is not reasonable or adequate for the services he actually renders. Therefore, the examiner finds that this claimant is being paid a wage which in fact is commensurate with the substance of the work he is doing for the motel and that he has been paid the sum of $140 a month for the months of April 1968 entitled to receipt of his retirement insurance benefits without imposition of deductions." [Tr. 28–29].

The case was remanded to the hearing examiner by the Appeals Council for the purpose of gathering additional evidence, and a supplemental hearing was held on May 21, 1970.

*The Hearing on May 21, 1970.*

The claimant and his wife were present with their attorney, Kirke W. Dale. The "Notice of Supplemental Hearing," [Tr. 18], listed the general issue to be determined as "whether deductions were imposable against the claimant's retirement insurance benefits beginning in April 1968." The specific issue on which findings were to be made and conclusions to be reached was "whether the claimant rendered substantial services in self-employment or received monthly wages in excess of the statutory amount, as provided by the Social Security Act, as amended." Mrs. Koeller was joined as a party.

At the supplemental hearing Mr. Koeller reiterated that before April 1, 1968 he managed all phases of the motel operation. He worked at the desk, made reservations, wrote letters, ordered supplies, supervised employees, hired and fired employees, wrote checks, and ascertained whether motel equipment needed repairs. All major decisions were decided by Mr. Koeller. He stated that since April 1, 1968 he has relinquished all managerial duties except those which he can perform during his regular hour and a half a day he spends at the Motel. He also said that he did not remain at the Motel in excess of an hour and a half a day. When he is at home, Mr. Koeller takes care of their son who was eleven and one-half years old at the time of the hearing. No one else is hired to take care of his son when he returns from school each day. When he is not at work, Mr. Koeller takes naps, reads the paper, mows the lawn, and he looks in on the lounge and restaurant at the Motel each day for approximately one hour. He sometimes gives advice to the managers of the lounge and restaurant. He now devotes time working for the Chamber of Commerce, and he goes hunting and fishing. Mr. Koeller owns a car wash which he leases to an individual. He spends little time there. He built an apartment complex which opened in April of 1968. The corporation has no interest in either the car wash or the apartment complex. Mr. Koeller mows the lawns at the apartments and also collects the rent. He also does maintenance work at the apartments, but he does not spend more than approximately eight hours a week working there. He renders no services at the apartments which could be considered either a hotel or motel service. Since Mrs. Koeller works an eight hour shift at the Motel, Mr. Koeller assists with the heavy housework at home. A cleaning woman is employed when necessary. Mr. Koeller testified that his wife took over his duties after his alleged retirement, and additional employees were hired. When she

is on duty, Mrs. Koeller orders supplies and equipment, otherwise such items are ordered by Mrs. Hadicke, an employee. A handyman normally services the air conditioner and heating equipment unless a problem arises which is too complicated for him to correct. In such instances whoever is on duty calls professional service men. If the air conditioner needs to be replaced, such a recommendation is made by Mr. Koeller. Mrs. Koeller still performs the daily bookkeeping, and Mr. Koeller sends in the monthly report which he states requires very little time. Bills that come in from suppliers are checked by whomever happens to be on duty at the desk. Mrs. Koeller checks the mail each day. The Koellers and Mrs. Hadicke are authorized to write checks for the Motel. If a guest becomes ill or there is a fire or other unexpected incidents, such matters are the responsibility of the clerk at the desk.

The salaries paid to Mr. and Mrs. Koeller are paid by separate checks issued to each individually. The checks are deposited into a joint account. Prior to April 1, 1968 Mrs. Koeller had received no salary from the corporation for her work at the Motel, but after that date she received $560 a month. Both Mr. and Mrs. Koeller write checks on their joint account for household expenses. Mr. Koeller stated that he felt that his wife's services were worth more than $560 a month, but that the corporation was unable to pay a greater salary. He also believed that his services were not worth more than his $140 a month salary because he had limited his time at the Motel. Mr. Koeller said that the responsibility for the management of the Motel has been assumed by his wife since April 1, 1968.

When they are home at night the Koellers sometimes discuss business, but little advice is given by Mr. Koeller to Mrs. Koeller. Mr. Koeller feels that she is competent to make business judgments by herself. He said he intended to surrender full control of operations and management of the Motel property to his wife.

Prior to April 1, 1968, Mr. Koeller was the general manager for the corporation in connection with the Motel, and he received a salary of $700 a month for such work. On April 1, 1968 he retired from the position of general manager. When he was general manager he received travel expenses from the corporation when he traveled on motel business out of town. He has received no such compensation since April 1, 1968.

In conclusion the hearing examiner propounded the following final questions to Mr. Koeller:

"Q. Let me ask you one question, Mr. Koeller. I think I asked you before. Why are you only required to spend an hour and a half a day at the motel? Do you, in fact, on an average, spend more time at the motel, I don't mean necessarily as a desk clerk, but do you spend any time there other than the hour and a half, just being around the premises?

A. Well, it is so convenient to get to the motel occasionally that sometimes I drop in in the afternoon, and walk through the place and go back out, or just talk to my wife for a minute and then go on, not particularly on business. The fact of the matter is she would run me off if I started digging into the business.

Q. At those times you drop by to visit her or to be around the premises, do you discuss business operations?

A. No, it is not a matter of discussing business. We made an agreement. She is running it, and if I weren't going to run it, I would keep my nose out of the place." [Tr. 121.]

The hearing examiner next questioned Mrs. Koeller. She stated that prior to April 1, 1968 she worked approximately five to six hours a day at the motel including holidays. She did not feel that she took much part in the management of the Motel, but did state that the man-

ner in which she and her husband ran the Motel was sometimes called a "Ma and Pa operation for a small motel." She does not spend many more hours at the Motel since April 1, 1968, and the main difference in the management and operation of the Motel is that she now does such work with new help instead of with Mr. Koeller. Mrs. Koeller is practically never at the Motel when Mr. Koeller is working at the desk for his one and a half hours each morning. She begins work in the afternoon. She stated that he is often there when she is working, but that on such occasions he is not working. He is just "in and out, and more or less getting under my feet * * * " They sometimes talk about the business, but she resents his giving any advice because she wants to run the Motel as she sees fit. Because she spends approximately the same amount of time at the Motel as she did before April 1, 1968, her home life has not changed to any great extent, except that Mr. Koeller now likes to do more of the home chores, and he is learning to do some cooking, especially outdoors.

Prior to April 1, 1968, Mrs. Koeller received no salary from the corporation and subsequent thereto she stated there actually has been little change in their financial situation. She is now paid a salary of $560 a month which is deposited in their joint account. She had never worried about not receiving a salary because they had always been well taken care of financially. She felt that the necessity of hiring additional help had definitely made a difference in their total financial picture. She estimated that the corporation now pays approximately $3,000 each year for additional help. Concerning the amount of salaries paid to Mr. and Mrs. Koeller the hearing examiner later asked:

"Q. There is just one question I would like to ask. As an officer of the corporation, can you tell me the circumstances surrounding the decision to reduce, that is, in numerical coincidence, your salary and your husband's current salary of $700? Is there any reason for that? In other words, he is getting $140 and you are getting $560, which is $700 that he formerly got. Can you tell me whether it is coincidence or whether there is a reason for that?

A. Well, I don't think you can say it was a coincidence. There was a reason, I suppose, to—so there wouldn't be a financial loss with me taking over and him retiring, a financial loss which we could not afford.

Q. In other words, the salary expense for the operation of the motel would be the same and you would still receive some services from Mr. Koeller, is that, in effect, what you are saying?

A. Some slight services, an hour and a half, etc. But that is a service, it helps.

Q. And this was also probably, correct me if I am wrong, he felt he would have some additional increase, outside help expense?

A. We knew there would be a lot, because I simply can't put in all of those hours. That was understood, so we have to hire somebody else.

Q. Do you think your services are worth $560 a month?

A. I certainly do.

Q. Do you think your husband is worth only $140?

A. Well, so far, what he does, yes." [Tr. 138–139.]

Mrs. Koeller's testimony as to her duties at the Motel substantiates what Mr. Koeller previously stated. Both Mr. and Mrs. Koeller spoke quite highly of the quality of the work performed by a Mrs. Hadicke, who replaced Mr. Koeller. As duties, Mrs. Hadicke helps Mrs. Koeller do, and which she did not do prior to April 1, 1968, lists scheduling work of the maids, interviewing, hiring and firing of employees, attending to equipment

failures, ordering supplies, sending out bills and preparing large group reservations. She feels there is no activity on the part of general manager which Mr. Koeller performed prior to April 1, 1968 that she is not competent to handle. She testified that Mr. Koeller is now free to come and go as he pleases, takes daily naps, cares for the lawn, takes care of their son, hunts and fishes.

Our scope of review of the final order of the Secretary is quite limited. The sole issue for this Court's determination is whether there is "substantial evidence" to support the Secretary's decision that plaintiff is not entitled to retirement benefits under the Act. [42 U.S.C. § 405(g).]

"Substantial evidence" has been defined as such " 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion' ". Gardner v. Bishop, 362 F.2d 917, 919 (10th Cir. 1966);

> "Substantial evidence means evidence sufficient to justify a refusal to direct a verdict in a jury case against a party having the burden of proof." [See Haley v. Celebrezze, (10th Cir. 1965) 351 F.2d 516, 517.]

In their decision rendered on August 20, 1969, the Appeals Council noted the general issue before the Council to be whether the claimant's old age benefits were subject to deductions for months beginning April 1968. The specific issues were the amount of the claimant's earnings as an officer and employee of Koeller Realty Company, Incorporated, Arkansas City, Kansas, during the calendar year 1968 and whether he earned more than $140 in the months April through December 1968. Following a review of the evidence in the record, the Appeals Council stated:

> "The claimant here does not contend that he was not an employee of the corporation after March 31, 1968, or that he performed no services for the corporation. He asserts, however, that his salary did not exceed $140 a month beginning April 1968; that such services as he did perform were insignif-

icant, and that his former duties were assumed by his wife.

The Appeals Council recognizes that the claimant's established hours of work were reduced and his services were curtailed. This does not per se establish that he is a 'retired individual' not subject to any deductions under sections (b) and (f) of the Act. The claimant and his wife who together own all of the stock in the corporation are able to effectively control and exercise full dominion over the affairs and assets of the corporation and to allocate as they please what is to be reported as wages for each. The Council concludes that the claimant's desire to receive benefits for himself and his minor child provided the motivation for his 'retirement' in April 1968. While the claimant had indicated that his wife merely substituted for him when he was away, by her own testimony she has played an active part in the business since the motel began operation in 1962. She has always worked in the business 5 or 6 hours a day and her hours did not change after her husband 'retired.'

In the opinion of the Appeals Council the reduction in the claimant's established hours at the motel was the only significant change in the overall operation of the business. The claimant retained his corporate shares and his position as an officer; he did not divorce himself from motel operations, he was present on the premises several times a day, he and his wife discussed business matters and by her own statement it was a 'Ma and Pa' affair. The Council interprets this statement to mean that both parties contributed their time and efforts to the success of the motel and that Mrs. Koeller's involvement in its operation preceded the time she assumed 'the responsibility for management.'

Despite the facts that she had been president of the corporation before April 1968 and had rendered services at the motel, she was not paid a salary until April 1968. Before that date,

the claimant's earnings had been used for support of their household. Since that date Mrs. Koeller's salary has been deposited to their joint bank account and used for their support. Therefore, economically, the claimant has continued to benefit from wages paid by the corporation even though channeled to his wife.

In consideration of the entire evidence of record, the Appeals Council believes that the claimant's and his wife's combined services to the motel were worth at least $700 a month which was the amount paid the claimant before April 1968 and the total of the amounts paid both beginning April 1968 and that their individual services were worth $350 a month. Accordingly, the Council finds that the claimant rendered services for Koeller Realty Co., Incorporated valued at $350 a month for the months April through December 1968 and that his total earnings for 1968 were at least $5,250 ($2,100 for the months January through March and $3,150 for the months April through December).

It is the decision of the Appeals Council that deductions are applicable against benefits based on the claimant's earnings record for the months April 1968 through December 1968. The decision of the hearing examiner is reversed."
[Tr. 10–11].

We note:

"The Secretary has, without question, the authority and the duty to pierce any fictitious arrangements among family members, and others, to shift salary payments from one to the other when the arrangement is not in accord with reality. The cases clearly demonstrate, as in Folsom v. O'Neal, 250 F.2d 946 (10th Cir.), where a person receiving a salary was not a bona fide employee the payment may be ignored for qualification purposes. Or in Poss v. Ribicoff, 289 F.2d 10 (2d Cir.), where there was a shifting of salary from husband to wife, and similarly in Flemming v. Lindgren, 275 F.2d 596 (9th Cir.); Newman v. Celebrezze, 310 F.2d 780 (2d Cir.) and Dondero v. Celebrezze, 312 F.2d 677 (2d Cir.). *However, there must be facts clearly developed in the record to support such a reallocation of the salary.*" [Emphasis supplied.] [Gardner v. Hall, 366 F.2d 132, 135 (10th Cir. 1966).]

In *Hall,* as here, there was evidence that the claimant had performed valuable services, but the principal issue throughout the proceedings was whether or not the claimant actually received wages for the services. The claimant in that case, together with his wife and three adult sons, operated a farm or ranch as a partnership. Each had a one-fifth interest, but none of the partners drew salaries for their services. The claimant was in active charge of the ranch during the partnership operation, and his wife was active in doing the bookkeeping for the ranch and related activities. A corporation was formed for the operation of the ranch, each of the former partners received stock, all were officers, and all officers except the claimant were paid a salary of $12,000 a year. Upon receipt of her check, the claimant's wife would ordinarily deposit it in a joint checking account that she and her husband maintained. The claimant did not draw on the account in the period in question, although he was empowered to do so. Some of the household expenses were paid from one account. The balance was loaned by the wife to the corporation. The claimant showed that he received no salary or other remuneration directly from the corporation for his personal services, which included two or three hours of advice to the other members of the family each day. The wife worked four or five hours a day for the corporation. At the time of incorporation the wife continued to perform the same services and was compensated for her duties, while the claimant received nothing. The Court found that "In so presenting his case, the claimant met his statutory burden of proof."

In *Hall, supra,* the principal issue on appeal revolved around the salary paid to Mrs. Hall by the corporation. The Court found that

> "The record before us contains no evidence, and no findings have been made that the salary paid Mrs. Hall is in any way excessive or not earned by her. There is no evidence to show that there was any shifting in the corporation of salary payments from the husband to the wife. As described above, the Secretary found that Mr. Hall's services were worth as much as Mrs. Hall's, that he worked half as long as she did, and his services were worth $6,000.00 per year. Necessarily therefore Mrs. Hall's services were found to be worth $12,000.00 per year. This being the case, there are no dollars paid to Mrs. Hall by way of salary which in reality represent services rendered by Mr. Hall. Therefore, the series of cases cited by the Secretary in his brief for reallocation of salaries, referred to above, are not applicable here. Furthermore since Mrs. Hall's salary was all her money, the fact that it may have been deposited in a joint bank account makes no difference, she could do what she wished with it including the use of it for household expenses, and the loan of it to the corporation."

The Court went on to refute the argument that because the Commissioner of Internal Revenue has authority to make some reallocation for tax purposes among family member shareholders, the Secretary has a similar power. The Court concluded on page 136:

> "The findings of the Secretary are, of course, conclusive if supported by substantial evidence, 42 U.S.C.A. § 405 (g); Folsom v. O'Neal, 250 F.2d 946 (10th Cir.); Dvorak v. Celebrezze, 345 F.2d 894 (10th Cir.), and the inferences drawn from the facts are accorded like treatment. However, when as here, the record does not contain any evidence upon which a finding of receipt of wages may be made the decision of the Secretary must fail. The various theories adopted by the Secretary during the administrative and judicial proceedings to establish a constructive payment are not valid."

In the instant case the record similarly contains no evidence that the salary paid Mrs. Koeller is in any way excessive or not earned by her. The Secretary recognized that the claimant's established hours of work were reduced and his services curtailed, and believes that the motivation for Mr. Koeller's "retirement" in April 1968 was the claimant's desire to receive benefits for himself and his minor child. This Court finds nothing illegal or improper about such a "motivation". The Secretary noted that Mrs. Koeller had always worked at the Motel five or six hours a day, her hours did not change after her husband "retired", and that she only began to receive her salary at the time of his "retirement". This Court believes that if she did the work, she is entitled to be paid for such labor. The Secretary also points out that Mr. Koeller received $700 for his work at the Motel prior to April 1, 1968, and that subsequent thereto the Koeller family continued to receive a total of $700 a month: $560 for Mrs. Koeller and $140 for Mr. Koeller. The Secretary further found that the only significant change in the overall operation for the business was the claimant's reduction in the established hours he was at the Motel, for he had not divorced himself from motel operations, was present on the premises several times a day, discussed business matters with his wife, and that his services were worth $350 a month. As was evidenced in Gardner v. Hall, *supra,* the fact that a person may perform for a corporation certain services, the value of which exceeds the salary he receives, this will not preclude him from receiving old-age insurance benefits unless he is receiving remuneration indirectly by some other method. The Secretary attempted to establish a means by which claimant re-

ceived additional remuneration by stating that because the Koellers had a joint checking account, and household liabilities were paid therefrom, Mr. Koeller "continued to benefit from wages paid by the corporation even though channeled to his wife." The United States Court of Appeals expressly disapproved of such reasoning absent a showing by the Secretary that the wife's salary was excessive for the duties she performed. No evidence to that effect is before this Court. In fact, there is no evidence in the record contradicting the statements that Mrs. Koeller assumed most managerial duties including scheduling work of maids, interviewing, hiring and firing of employees, attending to equipment failures, ordering supplies, sending out bills and organizing group reservations. Both Mr. and Mrs. Koeller testified that he had performed such work prior to April 1, 1968. She works fewer hours than he did, but she also is receiving a reduced salary and additional help costing approximately $2,700 a year have been hired since his "retirement".

Mr. Koeller is seeking old-age insurance benefits pursuant to 42 U.S.C. § 402(a), and the Secretary found in effect that because Mr. Koeller earned "$350" a month, statutory deductions were applicable to his insurance benefits. The Social Security Act provides that deductions shall be made from old-age insurance benefit payments if the claimant is charged with "excess earnings" for that month. See 42 U.S.C. § 403(b). "Excess earnings for a taxable year are earnings for such year in excess of the product of $140 multiplied by the number of months in such year, except that half of the first $1,200 excess shall not be included. See 42 U.S.C. § 403(f) (3). An individual's earnings for a taxable year are the sum of his wages for services rendered in such year. See 42 U.S.C. § 403(f) (5). Wages are defined as any remuneration paid for employment, including the cash value of all remuneration paid in any medium other than cash. See 42 U.S.C. § 409. In the instant case there is no evidence that Mr. Koeller has received remuneration for employment in excess of $140 since April 1, 1968. Therefore, the above deductions for excess earnings are not applicable to his case.

The United States Court of Appeals in Rasmussen v. Gardner, 374 F.2d 589, 594 (10th Cir. 1967) stated:

"The congressional policy underlying the federal social security legislation requires the courts to interpret the Act liberally, and any doubts should be resolved in favor of coverage. See Dvorak v. Celebrezze, 345 F.2d 894 (10th Cir.); Delno v. Celebrezze, *supra* [9 Cir., 347 F.2d 159]; Everett v. Ribicoff, *supra* [D.C., 200 F.Supp. 103]."

The Secretary has indulged in speculation and surmise and based his ultimate conclusion on an inference based on an inference; the Court therefore finds under Gardner v. Hall, *supra,* that there is not in law or fact substantial evidence to support the findings of the Secretary, that Mr. Koeller was not entitled to old-age insurance benefit payments after April 1, 1968, and such a finding must be reversed.

It is ordered that plaintiff's motion for summary judgment be sustained, and that the defendant's motion for summary judgment be overruled.

It is further ordered that the Clerk enter judgment in favor of plaintiff, Paul H. Koeller, and against defendant reversing the decision of Robert H. Finch, United States Secretary of the Department of Health, Education and Welfare. The Clerk is further directed to forward a copy of this decision and order to the parties herein named.